UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RACHAEL SWANSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:23-cv-00831-TWP-TAB |
| ) | |
| LILLY USA, LLC, ) | |
| ) | |
| Defendant. ) | |

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Lilly USA, LLC's ("Lilly") Motion for Summary Judgment (Filing No. 71). Plaintiff Rachael Swanson ("Swanson") initiated this action alleging unlawful employment practices, after she was terminated from Lilly for refusing to receive the COVID-19 vaccine. Swanson asserts claims under the Americans with Disabilities Act of 1990 ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Age Discrimination in Employment Act ("ADEA") (Filing No. 1). For the following reasons, Lilly's Motion is **granted**.

### I.     BACKGROUND

The facts stated below are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to Swanson as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     The Parties**

Lilly is a pharmaceutical company headquartered in Indianapolis, Indiana. Swanson began working for Lilly in 1998 as a sales representative (Filing No. 73-3 at 4 [25:2-8]). In 2013, she became an Executive Sales Representative in Lilly's Diabetes Business Unit and served in that role

until she was terminated on November 15, 2021.  *Id.* at 5 [26:23-27:15].  Swanson's sales territory covered various cities in Florida and her main customers were endocrinologists.  *Id.*  In Swanson's role, she had to visit healthcare providers treating patients with diabetes to educate them on Lilly's diabetes-related medications.  *Id.* at 21 [161:17-19]; *Id.* at 22 [169:16-19].  Swanson acted as the face of Lilly and was responsible for building strong relationships with her customers.  *Id.* at 23 [171:7-12].

B.      **COVID: The Global Pandemic**[1]

"As the Seventh Circuit noted in a recent decision, 'COVID [] requires no introduction.'" *Bar Indy LLC v. City of Indianapolis*, 508 F. Supp. 3d 334, 338 (S.D. Ind. 2020).  The Coronavirus disease ("COVID") is a very contagious disease that spread quickly throughout the United States and across the globe beginning in early 2020.[2]  The virus transmits rapidly from person to person, primarily through respiratory droplets emitted by coughing or sneezing that can travel multiple feet and remain in the air for several hours, and also through lingering particles on surfaces.  *Mays v. Dart*, 974 F.3d 810, 814 (7th Cir. 2020).  In March 2020, the White House announced a nationwide emergency and began instituting wide-scale travel bans and social distancing measures, while states implemented shutdowns to prevent the spread of COVID.[3]

---

[1] Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. The Rule provides "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources who cannot reasonably be questioned." Fed. R. Evid. 201(c).

[2] *About COVID-19*, CDC.GOV, https://www.cdc.gov/covid/about/?CDC_AAref_Val=https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19.html (last visited October 9, 2024).

[3] CDC Museum COVID-19 Timeline, CDC.gov, https://www.cdc.gov/museum/timeline/covid19.html (last visited October 9, 2024).

In February 2021, the first COVID vaccines were approved by the Food and Drug Administration.[4] The vaccine was first made accessible to high-risk populations, but as months passed, the vaccine became more broadly available to individuals (Filing No. 73-2 at 9 [120:11-121:4]. When vaccine availability increased, the federal government implemented COVID mandates for "federal employees and contractors" and "call[ed] on employers to do the same."[5]

**C.     COVID's Impact on Lilly**

Lilly and its employees were impacted by COVID. Between January and November of 2021, 688 employees reported to Lilly's Employee Health Services Team that they had tested positive for COVID-19 (*see* Filing No. 73-4). Some employees were hospitalized, and even worse died, from COVID (Filing No. 73-2 at 17 [226:20-227-8]).

During this time, Lilly learned that President Joseph Biden intended to issue Executive Order ("E.O.") 14042, a COVID vaccine mandate for federal contractors (Filing No. 73-1 ¶ 4). Lilly understood that pursuant to E.O. 14042, any of its contracts with the United States government would be jeopardized if its employees were not vaccinated against COVID. *Id.* The forthcoming E.O. informed Lilly's decision to implement a vaccine policy. *Id.*

**D.     Lilly's COVID Vaccine Policy**

On August 12, 2021, Lilly announced that it would require COVID vaccinations for all U.S.-based employees, effective November 15, 2021, to help "protect the health and safety of Lilly employees." (Filing No. 73-8 at 3 [269:7-14]). Lilly explained that "as a science-based company, [they] thoroughly reviewed all the data and options available to [them]. And [they] believe[d] this decision [was] in the best interests of [their] employees, [their] families and the patients [they]

---

[4] *Id.*

[5] *Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies*, WHITEHOUSE.GOV (Nov. 4, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/04/fact-sheet-biden-administration-announces-details-of-two-major-vaccination-policies/ (last visited May 10, 2024).

serve." (Filing No. 73-7.) Lilly also announced that employees could submit medical and religious accommodation requests and detailed the steps by which to do so (Filing No. 73-6).

### 1. Lilly's Accommodation Process

Following the Vaccine Policy announcement, Lilly informed employees that they could submit medical and religious accommodation requests and detailed the specific steps by which to do so (Filing No. 73-7; Filing No. 73-9). Employees who planned to request medical or religious accommodations were required to complete and submit the accommodation forms by Friday, September 10, 2021 (Filing No. 73-6 at 3). The deadline was established to provide Lilly with enough time to fully consider medical or religious accommodation requests, as well as to provide those employees whose exemption requests were conditionally granted sufficient time to secure a non-customer-facing role and any employees whose exemption requests were denied sufficient time to become vaccinated, all by November 15, 2021 (Filing No. 73-10 at 8-9).

#### a. Medical Accommodations

Lilly's Workplace Accommodation Team (the "WPA Team"), which included medical professionals, was responsible for handling medical accommodation requests (Filing No. 73-8 at 5 [289:4-13]). The WPA Team relied on science-based evidence and guidance from the Centers for Disease Control and Prevention ("CDC") to create a defined set of guidelines and to evaluate each medical accommodation request on an individualized basis (Filing No. 73-10 at 9-11). At the time, the CDC noted that only the following circumstances precluded an individual from receiving the COVID vaccine:

- Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine
- Immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine
- Temporary pregnancy accommodation
- Temporary accommodation x 90 days post monoclonal antibody infusion

4

*Id.* The CDC defined "severe" to mean that a person needed to be "treated with epinephrine or EpiPen" and/or was required to "go to the hospital," explaining that "[e]xperts refer to severe allergic reactions as anaphylaxis."[6] Lilly also considered providing exemptions for individuals who had recently received a medical treatment that would have interfered with the vaccination process (Filing No. 73-8 at 6 [292:12-19]).

The WPA Team evaluated all information and supporting medical documentation submitted with each accommodation request. *Id.* at 7 [298:21-299:1]. When additional information was needed, Lilly requested it from the employee. *Id.* at 6 [290:11-13]. Lilly evaluated additional information as it was provided. *Id.* Together, with the employee's medical records, the WPA Team consulted authoritative guidance specific to any claimed medical condition(s) that formed the basis of an employee's accommodation request in reaching a decision. *Id.* at 8 [306:14-22]).

By November 15, 2021, Lilly had received 165 medical accommodation requests (Filing No. 73-11). Of those requests, 64 were approved and accommodated and 101 were denied. *Id.*

b. **Religious Accommodations**

Religious accommodation requests were reviewed by a committee of employees from Human Resources and Employee Relations (Filing No. 73-10 at 6). Religious accommodation requests submitted after the September 10, 2021, deadline were denied as untimely absent limited exceptions for those who were on leave as of the deadline, joined Lilly after the deadline, or presented compelling extenuating circumstances related to specific state-law requirements (Filing No. 73-2 at 11 [161:2-16]).

---

[6] *See COVID-19 Vaccines for People with Allergies*, CDC, last updated Jul. 31, 2021, https://www.cdc.gov/vaccine-safety/vaccines/covid-19.html#:~:text=If%20you%20had%20a%20severe,receive%20the%20alternate%20vaccine%20type.

Lilly received 371 religious accommodation requests, of which 345 were approved and 26 were denied (Filing No. 73-12).

### c. Accommodations Provided

Accommodations were provided for employees whose accommodation requests (religious or medical) were approved. The accommodations varied depending on the nature of the employee's particular role (Filing No. 73-10 at 20). Lilly offered customer-facing employees with approved accommodations the opportunity to apply for a non-customer facing role. *Id.* Employees in non-customer-facing roles, who received an approved accommodation, could remain unvaccinated but were required to wear a mask, socially distance, and undergo regular COVID testing. *Id.* Lilly determined that allowing customer-facing employees to remain in their roles unvaccinated would impose an undue hardship, so this was not an option. *Id.*

Requiring employees in customer-facing roles to transition to non-customer-facing roles was necessary because of the essential functions of their roles (Filing No. 73-2 at 3 [43:17-44:10]). Customer-facing employees were expected to enter healthcare facilities, such as hospitals, on behalf of Lilly, and work in close proximity to providers and their vulnerable patient populations (Filing No. 73-10 at 20). Many of Lilly's customers required pharmaceutical salespeople and other vendors to be vaccinated before entering the facility. Allowing employees in customer-facing roles to remain unvaccinated would create a performance issue because they would be unable to perform their job duties without in-person customer interactions (Filing No. 73-2 at 10 [128:18-129:12]; Filing No. 73-1 ¶¶ 7, 8; Filing No. 27; Filing No. 28).

### E. Swanson's Accommodation Requests

While in her customer facing role, Swanson adhered to Lilly's policy of wearing a mask, submitting to testing, and social distancing, and successfully performed her duties and interacted with coworkers while being unvaccinated from March 2020 to November 15, 2021,

6

without incident. Lilly's Mandate was announced on August 12, 2021, and in response, Swanson made accommodation requests.

### 1. Swanson's Medical Accommodation Request

#### a. Swanson's Medical History

In 2015, Swanson had an adverse reaction to the flu vaccine (Filing No. 73-3 at 26 [226:11-18]). A month after she received the flu vaccine, she began to experience burning, tingling, numbness, pain, and paralysis. *Id.* at 16-17 [105:21-106:10]. These symptoms lasted for three days. *Id.* at 17 [108:14-16]. Swanson's residual symptoms lasted longer . *Id.*

Swanson went to see her primary care physician, Dr. Bruce Lipschutz ("Dr. Lipschutz") regarding her symptoms, *id.* at 17 [106:11-12], and she was diagnosed with carpal tunnel syndrome, bilateral shoulder pain, and cervical muscle pain (Filing No. 76-4 at 1). Dr. Lipschutz informed Swanson that she likely had Guillain-Barre Syndrome ("GBS") due to the timing of her vaccine and the onset of her symptoms (Filing No. 76-14 at 17 [110:10-19]). However, Swanson's medical records from Dr. Lipschutz do not note that she has, or has ever had, GBS.

In August 2021, Swanson began seeing a new primary care physician, Dr. Jelin Israel-Cvik ("Dr. Israel") (*see* Filing No. 73-16). Dr. Israel noted: "[Swanson] works as a pharmaceutical rep for Lilly and the covid vaccine is mandated for her job. She is reluctant to get the vaccine due to her prior hx of reaction to the flu vaccine[;] possible [GBS]." *Id.* at 27. Dr. Israel further noted: "will write letter for covid vaccine exception based on prior hx of GBS after flu vaccine." *Id.* at 28. Although Dr. Israel was not Swanson's physician at the time she received the flu vaccine, Dr. Israel reviewed Swanson's medical history from 2016 and 2017. *Id.* at 27.

#### b. Swanson Submits a Medical Accommodation Request

On September 9, 2021, Swanson submitted a medical accommodation request to Lilly's Vaccine Policy (Filing No. 73-14). She sought an accommodation due to her reaction to the flu

vaccine in 2015 (Filing No. 73-3 at 26 [226:11-18]). Swanson stated in her request that her adverse reaction to the flu vaccine was "no[t] a contraindication" (Filing No. 73-14 at 4).

As part of her accommodation request, Swanson was also required to submit a form completed by her healthcare provider, as indicated in bold and capital letters at the top of the form: "**TO BE COMPLETED BY HEALTHCARE PROVIDER.**" *Id.* at 5 (emphasis in original). Swanson submitted a completed form but admitted that she completed the entire form herself (Filing No. 73-3 at 27 [233:11-19]). The form stated that her purported impairment does not "substantially limit [her] in any major life activity (such as eating, thinking, self-care, etc.) or major bodily function" and does not impact her ability to perform any essential job duties (Filing No. 73-14 at 5).

Swanson's accommodation request also included a letter from Dr. Israel, dated September 8, 2021, stating: "[I]t is my advice that [Swanson] does not get the CoV-2 vaccine due to a prior significant adverse reaction to another vaccine. Getting the CoV-2 vaccine could potentially have more harmful effects on this particular patient." *Id.* at 6.

    c. **Lilly Requests Additional Information from Swanson**

After Swanson submitted her medical accommodation request, Lilly's WPA Team emailed her on September 16, 2021, seeking additional information about her request (*see* Filing No. 73-18). The requested information was to be submitted by September 22, 2021. *See id.* Five days after the deadline, Swanson asked the WPA Team: "What specific information are you requesting?" (Filing No. 73-19). The WPA Team responded: "[W]e need your provider to specify what symptoms were experienced at the time of adverse reaction to your previous flu vaccine." (Filing No. 73-20.) On October 1, 2021, Swanson re-sent the same letter from Dr. Israel that she had submitted with her original accommodation request and stated that it was her "'final' follow-up to [the] request from the WPA Team." (Filing No. 73-21.)

8

On October 4, 2021, Dr. Gentry Dodd of Lilly's WPA Team provided an assessment of Swanson's request, stating: "I think this is a denial due to 1) no new information submitted, 2) provider verbiage of "adverse reaction," and 3) employee's description of symptoms are not consistent with anaphylaxis (but are likely indicative of previous [GBS], which is not a contraindication to the COVID vaccines)." (Filing No. 73-22.) On October 6, 2021, the WPA Team informed Swanson that her medical accommodation request was denied (Filing No. 73-23).

Two weeks later, on October 21, 2021, Swanson replied to the WPA Team asking them to confirm that her medical accommodation request was denied (Filing No. 73-24 at 4). The WPA Team responded that her request was denied but provided a third opportunity to submit additional information. *Id.* On November 5, 2021, Swanson asked "what specific validated medical information" her doctor needed to provide. *Id.* at 3. The WPA Team responded informing Swanson that her provider's letter did not substantiate the request for COVID vaccination accommodation. *Id.* at 3. The WPA Team gave Swanson another opportunity to submit additional information. *Id.*

On November 9, 2021, Swanson informed the WPA Team that she had an appointment with her healthcare provider and the WPA Team had her consent to speak by phone to her healthcare provider, to discuss her vaccine and serious adverse event in 2015. *Id.* at 2. The WPA Team did not reach out the Swanson's healthcare provider. Instead, the WPA Team responded asking Swanson, for a fifth time, to provide any "new information from her healthcare provider." *Id.* Swanson did not submit any additional information or documentation (Filing No. 73-14 at 7).

**2. Swanson's Religious Accommodation Request**

Swanson is a Christian Baptist (Filing No. 73-3 at 6 [42:9-13]). She previously attended McGregor Baptist Church in Fort Myers, Florida but has not attended any full church service in the past eight years. *Id.* at 7 [50:7-14]. Swanson has not been in touch with the former pastor of

McGregor Baptist, (Pastor Holbrook), and is unaware of who the new pastor is. *Id.* at 8 [55:24-56:1].

On November 4, 2021, after her medical accommodation request was denied, Swanson had a conversation with her supervisor, Anu McFreen, about submitting a religious accommodation request (Filing No. 73-3 at 28[267:2-12]). This was two months after the deadline for religious accommodation requests had passed. *Id.* at 28[267:23-25]. Swanson asked for the link to the religious accommodation request form but never stated what her religious accommodation request was going to be based on. *Id.* at 28 [268:13-19]; *Id.* at 29 [273:7-11]. Swanson was never aided in finding a link to the religious accommodation form (Filing No. 76-14 at 54[282:13-18]). Swanson never completed the form or submitted a religious accommodation request (Filing No. 73-3 at 28 [268:24-269:21]).

Swanson testified that she has "both a religious and spiritual objection" to the COVID vaccine. *Id.* at 9 [58:24-59:2]. Religiously, Swanson does not want to receive the vaccine because there are "some fetal cell lines involved" in some of the vaccinations for COVID. Swanson admits that she has taken over-the-counter medications but has never researched whether any such medication used fetal cells or were based on research related to fetal cells. *Id.* at 10 [62:23-63:4]. Spiritually, Swanson does not want to receive the vaccine because it goes against bodily autonomy. Swanson believes she "should have the choice whether to inflict harm on the body or not as it states in the Bible." *Id.* at 12 [77:2-7].

## II.     LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, at 584. "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted). Additionally, the Court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes. *Id.* (citation and quotation marks omitted); *see Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021).

### III.  DISCUSSION

Swanson initiated this action alleging that Lilly's denial of both her medical and religious accommodation to not receive a COVID-19 vaccine, was in violation of the ADA, Title VII, and

the ADEA. Lilly seeks summary judgment on all claims listed in Swanson's Amended Complaint. Lilly contends that Swanson's suit is based solely on her personal dissatisfaction with Lilly's neutral, universally applied COVID vaccine requirement. Lilly argues that Swanson's failure to accommodate claim in violation of the ADA fails because she did not have a qualified disability and her failure to accommodate claim under Title VII fails because she did not request a religious accommodation. Lilly also argues Swanson's ADEA claim fails because she was not replaced by an individual younger than her.

Swanson maintains that there is enough evidence to support her ADA and Title VII failure to accommodate claims. However, she acknowledges there is insufficient evidence to support her age discrimination claim and abandons it (*see* Filing No. 76 at 8, n.2). Accordingly, Swanson's ADEA claim is **dismissed**. The Court will discuss Swanson's remaining claims in turn.

A. <u>**ADA Failure to Accommodate Claim**</u>

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer must reasonably accommodate the known physical or mental limitations of an otherwise qualified individual unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). To establish a *prima facie* case of Lilly's failure to accommodate under the ADA, Swanson must show that: (1) she is a qualified individual with a disability; (2) Lilly was aware of her disability; and (3) Lilly failed to reasonably accommodate the disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (quoting *Sears, Roebuck & Co.*, 417 F.3d at 797); *see Equal Emp. Opportunity Comm'n v. AutoZone, Inc.*, 630 F.3d 635, 638 n.1 (7th Cir. 2010) (noting that adverse employment action is not an element of a *prima facie* case of a failure to accommodate). A "qualified individual"

is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

As a threshold matter, Swanson must produce sufficient evidence to demonstrate she has a disability within the meaning of the ADA. Swanson can prove that she is disabled for ADA purposes in one of three ways: (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment by her employer. 42 U.S.C. § 12102(2); *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999).

Swanson argues that she is disabled because she suffers from a physical impairment following her adverse reaction in 2015, to the flu vaccine (Filing No. 76 at 28). A physical impairment means "any physiological disorder or condition… affecting one or more body systems, such as neurological, musculoskeletal… respiratory (including speech organs) …, immune, [and] circulatory" systems. 29 C.F.R. § 1630.2(h)(1). Conditions that are episodic or in remission may qualify if they "would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii).

Although an impairment that "substantially limits" is construed broadly, not every impairment constitutes a disability within the meaning of the ADA. 29 C.F.R. § 1630.2(j)(1)(ii). The impairment must limit a "major life activity." "Major life activities" are things such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "Major life activities" also include "the operation of a major bodily function." *See id.* at § 12102(2)(B). The mere existence of a medical condition, on its own, does not establish a disability; instead, Swanson must present evidence that her adverse flu

13

reaction, or resulting GBS, substantially limited a major life activity. *See Frazier-Hill v. Chicago Transit Auth.*, 2022 WL 787970, at *16 (N.D. Ill. Mar. 15, 2022), *aff'd* 75 F.4th 797 (7th Cir. 2023).

Swanson has not designated any evidence showing the effect of GBS on the functions of her immune system. She cites one-page of her medical record which simply states she was diagnosed with GBS (*see* Filing No. 73-16 at 33). Another portion of Swanson's medical record states that Dr. Israel would "write a letter for covid vaccine exception based on prior hx of GBS after flu vaccine." *Id.* at 28. Neither portion of Swanson's medical record explains whether or how GBS affects her immune system or any other major life activity. Instead, Swanson relies on case law from other jurisdictions to support the proposition that GBS is a rare-autoimmune disease that affects the body's immune system (*see* Filing No. 76 at 29).

The Seventh Circuit has held that a plaintiff must prove they were substantially limited in a major life activity *at the time the accommodation request was denied*. *Frazier-Hill*, 75 F.4th at 805. At the time the accommodation request was denied, Dr. Israel stated that Swanson's adverse reaction to the flu vaccine (or her resulting GBS) did not substantially limit any of her major life activities, bodily functions, or ability to perform essential job duties (*see* Filing No. 73-14 at 5). Any argument raised in briefing explaining how GBS affected Swanson's immune system is without merit.

Because Swanson has failed to establish that she is a qualified individual with a disability, her claim automatically fails, and the Court need not discuss other arguments raised by the parties. *See Kotwica*, 637 F.3d at 748. Accordingly, Swanson's ADA failure to accommodate claim is **dismissed**.

B.   <u>Title VII Failure to Accommodate Claim</u>

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's …

religion." 42 U.S.C. § 2000e-2(a). To state a *prima facie* case of religious discrimination for failure to accommodate, Swanson must show: "(1) an observance or practice that is religious in nature, and (2) that is based on a sincerely held religious belief, (3) conflicted with an employment requirement, and (4) the religious observance or practice was the basis or a motivating factor for the employee's discharge or other discriminatory treatment." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 883 (7th Cir. 2023), *vacated on other grounds*, 2023 WL 4842324 (7th Cir. July 28, 2023).

To prove a failure to accommodate her religion, Swanson must first show that she "called the religious observance or practice to [her] employer's attention." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013). An employee who wants to invoke an employer's duty to accommodate her religion under Title VII must give the employer fair notice of her need for an accommodation and the religious nature of the conflict. *Id.* at 450. An employee is not required to use "magic words" to make a legitimate request for a religious accommodation under Title VII, but they must "at least say something" to indicate their need for an accommodation. *See Monroe v. Indiana*, 2016 WL 1270202, at *12 (S.D. Ind. Mar. 31, 2016); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 687 (7th Cir. 2008); *see also Reed v. Great Lakes Companies, Inc.*, 330 F.3d 931, 935 (7th Cir. 2003) ("Title VII imposes a duty on the employer but also a reciprocal duty on the employee to give fair warning of the employment practices that will interfere with his religion and that he therefore wants waived or adjusted.").

Swanson argues that Lilly was on notice of her need for an accommodation when she asked her manager for assistance in locating the link to the religious accommodation document (Filing No. 76 at 42). Swanson further contends that Lilly failed to engage in the interactive process when

they refused to direct her to the link and "simply said her request would be denied if she submitted one." *Id.*

Swanson does not cite any evidence demonstrating that Lilly was aware of her religious beliefs. Swanson requesting a link to an accommodation form two months after the deadline, at best, suggests that she intended to submit a religious accommodation request, albeit late. However, an intent to submit a religious accommodation does not put an employer on notice of a need for an accommodation. *See Dzik v. Accident Fund Ins. Co.*, No. 1:23-CV-193, 2024 WL 662485, at *7 (W.D. Mich. Jan. 25, 2024) ("Plaintiff's alleged intention to submit an accommodation request [], but failure to do so [], does not plausibly show that Plaintiff put Defendant, his employer, on notice of the conflict between his religious beliefs and the [p]olicy.").

Swanson's argument that her supervisor informed her that even if she submitted a religious accommodation request, her request would be denied (*see* Filing No. 76 at 42), is not supported by the record. The designated evidence shows that Swanson informed her supervisor that she "scouted out [] two positions on Lilly's job portal which showed there were two remote positions" and that she could "apply for those positions." (Filing No. 76-14 at 50[274:13-19]). The supervisor responded that they were "out of time at this time" and did not "have time to get [Swanson] into anything." *Id.* [274:20-22]. This conversation between Swanson and her supervisor is responding only to Lilly's ability to get her transitioned into a new position by November 15, 2021. Swanson's argument mischaracterizes the evidence to suggest that Lilly refused to engage in the interactive process. More importantly, Swanson never submitted a religious accommodation request or informed any employee at Lilly of her specific religious beliefs. Lilly cannot accommodate a religious belief they were never made aware of. *Cf. Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (noting that in the context of Title VII retaliation cases, an employee's

16

failure to mention an issue to an employer forecloses such claim because an employer cannot retaliate when it is unaware of any complaints). For this reason, Swanson's Title VII failure to accommodate claim is **dismissed**.

### IV.   CONCLUSION

For the reasons stated above, Lilly's Motion for Summary Judgment (Filing No. 71) is **GRANTED** as to all claims. Final judgment will issue under separate order.

SO ORDERED.

Date: 11/15/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

Taylor Jon Ferguson
BIESECKER DUTKANYCH & MACER, LLC
tferguson@bdlegal.com

Benjamin M. Ostrander
WINSTON & STRAWN/Chicago
bostrander@winston.com

David D. Leishman
MCGUIRE WOODS LLP (Chicago)
dleishman@mcguirewoods.com

Kara Elizabeth Cooper
WINSTON & STRAWN/Chicago
kecooper@winston.com

Michael P. Roche
WINSTON & STRAWN/Chicago
mroche@winston.com

Sarah Kreger
WINSTON & STRAWN/Chicago
skreger@winston.com